UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| STUDIOROTAN LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cv-20-GMB |
| | ) | |
| VICKII J. HOWELL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Studiorotan LLC has filed a Motion for Preliminary Injunction. Doc. 28. The motion is fully briefed (Docs. 28-1, 33 & 35) and the court held an evidentiary hearing on the motion, which has now been transcribed. Doc. 49. For the following reasons, the court concludes that the motion for preliminary injunction is due to be denied.

## I. RELEVANT BACKGROUND[1]

### A.    The Clotilda and Africatown

A team of researchers discovered the wreckage of the Clotilda, the last known slave ship in the United States, in 2018. *See* Doc. 1. at 4. The Clotilda "illegally brought enslaved individuals from Africa into Alabama around 1860, where the ship

---

[1] The court takes much of this background information from the complaint. The court uses these facts for no other purpose than to provide context for the motion for preliminary injunction.

was scuttled and burned to hide evidence of illegal slave trading." Doc. 1 at 4. Many of these slaves returned after the Civil War and founded Africatown near Mobile, Alabama. Doc. 1 at 4; *see also* https://nmaahc.si.edu/explore/initiatives/slave-wrecks-project/africatown-alabama-usa (last visited Oct. 29, 2025).

## B.    Africatown International Design Competition

Renee Kemp-Rotan, "an internationally regarded urban designer and master planner," operates Studiorotan. Doc. 1 at 3. During 2018, Defendant M.O.V.E. Gulf Coast CDC ("M.O.V.E.") "invited Studiorotan to Africatown and asked Studiorotan to be involved in a project that would bring many community-based, non-coordinated projects into a comprehensive plan, design and development for Africatown." Doc. 1 at 4–5. In that vein, Studiorotan, M.O.V.E., and Defendant Vickii Howell developed a competition—the Africatown International Design Competition—"for professional architects to submit design boards and essays" related to the "Clotilda Discovery and furthering preservation and revitalization of the Africatown community." Doc. 1 at 5.

According to the complaint, Studiorotan and M.O.V.E. entered into a contract under which Studiorotan "would provide its skills as a Professional Competition Advisor in exchange for $100,000." Doc. 1 at 5. Kemp-Rotan "was the primary Professional Competition Advisor," while Howell served as "the Competition Coordinator for M.O.V.E. and the primary point of contact between Studiorotan and

M.O.V.E." Doc. 1 at 6. "In furtherance of the Agreement, Studiorotan conducted the competition, which included programming four sites and 16 venues, creating design program challenges, and securing sponsorships and funding from national organizations such as the American Institute of Architects (AIA), National Organization of Minority Architects (NOMA), and Visit Mobile." Doc. 1 at 7. Additionally, Studiorotan "created a significant amount [of] original intellectual property, including design challenges, framework documents, and animations used for the Competition." Doc. 1 at 8.

## C.    The Complaint

Studiorotan filed its complaint against Howell and M.O.V.E. after the business relationship soured. Among other things, Studiorotan alleges:

- At Howell's direction, M.O.V.E. began misappropriating the work done by Studiorotan. Doc. 1 at 8.

- Howell misrepresented the ownership of the intellectual property by claiming that the competition results and Studiorotan's work belonged to M.O.V.E. exclusively. Doc. 1 at 8.

- Howell disseminated intellectual property created by Studiorotan to solicit funding for M.O.V.E. Doc. 1. at 8.

- M.O.V.E. used Studiorotan's intellectual property to pitch a grant from the Mellon Foundation. Doc. 1 at 9.

- M.O.V.E. directly benefitted from the use of Studiorotan's intellectual property in its fundraising efforts and raised "tens of thousands of dollars" from Studiorotan's work. Doc. 1 at 9–10.

- Howell disseminated false and defamatory information to Africatown descendants and representatives from the World Monuments Fund to discredit Kemp-Rotan and Studiorotan. Doc. 1 at 10–11; *see also* Doc. 28-2 at 4.

The complaint asserts five claims: (1) breach of contract; (2) copyright infringement; (3) unjust enrichment; (4) tortious interference with business relationships; and (5) defamation. In the pending motion, Studiorotan asks the court to enjoin Howell and M.O.V.E. from (1) infringing on certain copyrighted works owned or controlled by Studiorotan; (2) using Studiorotan's registered mark of THE AFRICATOWN INTERNATIONAL IDEA COMPETITION or "any confusingly similar designation" in certain designated ways; and (3) "repeating, publishing, or causing to be published any untruthful, inflammatory, defamatory or false-light statements about Studiorotan or Renee Kemp-Rotan." Doc. 28 at 2–3. The motion also asks for other ancillary relief, including the interpleading of funds, impoundment of products, preservation of records, and a sworn report of compliance by Howell and M.O.V.E. Doc. 28 at 3–4.

## II. FACTUAL FINDINGS

The court makes the following factual findings based on the evidence received at the hearing and Kemp-Rotan's affidavit.

1.      Kemp-Rotan applied for and received copyright registrations for:

   a.      The Africatown International Design Idea Competition Why a Competition and 7 Other Unpublished Works with Registration Number PAu 4-210-458;

4

      b.      Africatown Design Competition Poster 1 with Registration Number VAu 1-521-715; and

      c.      Africatown Design Competition Poster 2 with Registration Number VAu 1-521-718.

Doc. 28-2 at 1–2; Docs. 48-1, 48-2 & 48-3; Doc. 49 at 31–32, 38, 70, 74–81.

2.      As components of the copyright for The Africatown International Design Idea Competition Why a Competition and 7 Other Unpublished Works compilation, Kemp-Rotan created and submitted nine videos to the copyright office, including those titled (1) The Africatown International Design Idea Competition; (2) Why a Competition; (3) Spirit of the Ancestors; (4) Ten Things to Know; (5) 12 Headlines; (6) Meet the Players; (7) Afro-Futurism; and (9) Design the Sites. Doc. 49 at 50–51, 70, 74–81.

3.      Kemp-Rotan also created and designed Competition Poster 1, which "ended up being really the iconic organizational tool for the competition." Doc. 49 at 31–32.  It was "a very easy way that even a layman could understand what it was the competition was trying to do." Doc. 49 at 31.

4.      Kemp-Rotan also created and designed Competition Poster 2, which was a graphic description of the competition submissions and results. Doc. 49 at 38.

5.      Kemp-Rotan sent all the works she created to Howell and M.O.V.E., including all nine videos and both posters. Doc. 49 at 70, 74–81, 105, 109.

6.      Kemp-Rotan introduced evidence at the hearing in the form of a screen

capture of the first page of the Africatown International Design Idea Competition website. Doc. 48-15; Doc. 49 at 87–88, 90.  The website remains active. Doc. 49 at 37.  The screenshot depicts the landing page of the competition website, over which Howell has exclusive control. Doc. 49 at 65, 66.  This page features an image of Competition Poster 1. Doc. 48-15 at 1; Doc. 49 at 67, 90.  The screenshot also contains nine thumbnail images corresponding with the nine copyrighted videos. Doc. 48-15 at 4; Doc. 49 at 90–91.

7.    Kemp-Rotan sent an invoice to Howell and M.O.V.E. for work completed from April 30 to June 27, 2019. Doc. 48–6; Doc. 49 at 40–41.  The total amount invoiced was $18,300, and this included work for website design, branding, and other tasks. Doc. 48-6 at 1; Doc. 49 at 41.  Kemp-Rotan did not expect the invoice to be paid in full at that time and requested only that Howell and M.O.V.E. pay $5,000 of the total. Doc. 48-6 at 1; Doc. 49 at 102.  Howell and M.O.V.E. paid a "marginal amount" of the invoice. Doc. 48-9 at 42.  Kemp-Rotan nevertheless "expect[ed] that as some point [she] would be paid in full." Doc. 48-9 at 42.

8.    The Africatown International Idea Competition held its Juneteenth Awards Ceremony in June 2023. Doc. 28-2 at 3; *see also* Doc. 48-13; Doc. 49 at 61.

9.    Kemp-Rotan recruited a number of judges for the competition, none of whom were paid for their work. Doc. 49 at 47.

10.    On July 31, 2023, Kemp-Rotan sent an invoice to Howell as CEO of

M.O.V.E. for "5 years of services rendered for the Africatown International Design Competition." Doc. 48-12; Doc. 49 at 58, 60.  Kemp-Rotan stated on the invoice that Howell and M.O.V.E. had paid Studiorotan $44,300 to date, and she requested a commitment to pay the remaining $55,700 according to a fee schedule. Doc. 48-12. The fee schedule would have required M.O.V.E. to pay Studiorotan $6,962.50 each month from August 2023 through March 2024. Doc. 48-12.  There is no evidence that Howell or M.O.V.E. made any payments under this schedule.

11.    On July 10, 2024, Kemp-Rotan sent Howell and M.O.V.E. a letter detailing the work Studiorotan had performed for the design competition. Doc. 48-13 at 1–2; Doc. 49 at 60–62.  The letter noted that the competition had ended a year earlier but Studiorotan was still owed $57,000. Doc. 48-13 at 2; Doc. 49 at 61. Among other items, Kemp-Rotan detailed Studiorotan's ownership in the original works created for the competition, mentioned that they had been copyrighted, and said that Howell "continue[d] to use [the] works without consent, regard or payment." Doc. 48-13 at 3; *see also* Doc. 49 at 63.  Kemp-Rotan then demanded that M.O.V.E. "immediately stop reproducing, publishing, distributing, transmitting, displaying, and publicly performing exact copies of materials that incorporate substantial portions of Studiorotan's work without permission." Doc. 48-13 at 3; *see also* Doc. 49 at 63–64.  She also wrote that M.O.V.E. "must immediately cease such infringing activity and desist such infringing activity in the future" and must

enter into a licensing agreement with Studiorotan if it wants to use the original works. Doc. 48-13 at 3; *see also* Doc. 49 at 64. Kemp-Rotan did not receive a response to this letter. Doc. 49 at 64.

12. To this day, Howell and M.O.V.E. continue to use the works Kemp-Rotan created and copyrighted. Doc. 49 at 64, 101.

## III. DISCUSSION

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008). In fact, the grant of a preliminary injunction is "the exception rather than the rule." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983). To obtain a preliminary injunction, the moving party must: (1) demonstrate "a substantial likelihood of success on the merits"; (2) show that the preliminary injunction is necessary to prevent irreparable injury; (3) show that the threatened injury outweighs any harm that might result to the non-movant; and (4) show that the preliminary injunction is not adverse to the public interest. *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995); *Parker v. St. Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir. 2001); *Winter*, 555 U.S. at 20. "The plaintiff bears the 'burden of persuasion' on each of these four factors." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

At the outset, the court finds that Studiorotan cannot prevail on its request for a preliminary injunction against trademark infringement. *See* Doc. 28 at 2–3. "[A]ny

motion . . . for . . . a preliminary . . . injunction must be based upon a cause of action." *Alabama v. U.S. Army Corps of Engs.*, 424 F.3d 1117, 1127 (11th Cir. 2005). In other words, "injunctive relief must relate to the relief requested in the [operative] complaint." *Puello v. Mendez*, 2020 WL 4004481, at * 4 (M.D. Fla. June 15, 2020). The complaint does not state a claim for trademark infringement, nor does it mention the mark referenced in the motion. *See* Doc. 1. Accordingly, this portion of the motion is due to be denied.

The court next addresses the request for a preliminary injunction on Studiorotan's claims for copyright infringement and defamation.

## A.     Copyright Infringement

A copyright provides for the exclusive right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). "To succeed on its claim of copyright infringement, [a plaintiff] must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020) (internal quotation marks and citation omitted).

### 1.     *Likelihood of Success on the Merits*

For the reasons to follow, the court concludes that Studiorotan has a likelihood of success on the merits as to (1) Competition Poster 1 and (2) the thumbnails of the

competition videos.  Studiorotan has not established a likelihood of success on the merits as to Competition Poster 2 or the content of the competition videos.

### a.    Ownership of Valid Copyright

Studiorotan presented evidence of three registered copyrights:

1.    The Africatown International Design Idea Competition Why a Competition and 7 Other Unpublished Works with Registration Number PAu 4-210-458;

2.    Africatown Design Competition Poster 1 with Registration Number VAu 1-521-715; and

3.    Africatown Design Competition Poster 2 with Registration Number VAu 1-521-718.

Docs. 48-1, 48-2 & 48-3.  "A copyright registration proves '*prima facie* proof of the existence of a valid copyright.'" *C.B. Fleet Co. v. Unico Holdings, Inc*., 510 F. Supp. 2d 1078, 1081 (S.D. Fla. 2007) (citation omitted).  Accordingly, "the burden shifts to the defendant to demonstrate why the claim of copyright is invalid." *Bateman v. Mnemonics, Inc*., 79 F.3d 1532, 1541 (11th Cir. 1996).  Although Howell and M.O.V.E. advance a number of arguments against the validity of the copyrights, none are persuasive.

Howell and M.O.V.E. first claim that "Plaintiff and Defendant worked jointly to create intellectual property that Plaintiff has subsequently filed for copyright registrations." Doc. 33 at 3.  But arguments in a brief are not evidence, and the defendants did not present any evidence to support this claim. *Travaglio v. Am. Exp.*

*Co.*, 735 F.3d 1266, 1270 (11th Cir. 2013) ("Statements by counsel in briefs are not evidence").

The defendants next argue that the copyrights are invalid because Studiorotan published the works before the registration. *See* Doc. 33 at 5; *see also* Doc. 49 at 124–25. Copyright protection attaches at the time of an author's creation of an original work susceptible to copyright. 17 U.S.C. § 102(a). The owner's cause of action for infringement of that copyright, however, is unenforceable until compliance with the formalities of registration, including payment of fees and deposit of copies of the work. 17 U.S.C. § 411. The statute requires an owner to file her registration "within five years after first publication of the works." 17 U.S.C. § 410(c). At that point, the certificates of registration for the works "'constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate.'" *Donald Frederick Evans & Assoc., Inc. v. Cont. Homes, Inc*., 785 F.2d 897, 903 (11th Cir. 1986) (quoting 17 U.S.C. § 410(c)). Here, Kemp-Rotan filed the registrations on January 11, 2024—within five years of the first publication of Competition Posters 1 and 2 and the competition videos. Docs. 48-1, 48-2 & 48-3. This argument is unavailing.

Finally, the court is not persuaded by the claim that the copyright for the competition videos is invalid because Kemp-Rotan grouped them in one copyright registration instead of individual registrations. *See* Doc. 49 at 124. Howell and

M.O.V.E. did not present any legal support for this argument, and the court can find none. Instead, the statute permits the registration of multiple works in a single registration. Under 17 U.S.C. § 408(c)(1), the Register of Copyrights regulates the way in which works are classified. That section specifically authorizes the Register to allow "a single registration for a group of related works." 17 U.S.C. § 408(c)(1). And, where, as here, the collection is already published, it may be registered as a single work if "all copyrightable elements . . . are otherwise recognizable as self-contained works, . . . are included in a single unit of publication, and . . . the copyright claimant is the same." 37 C.F.R. § 202.3(b)(4)(i)(A). There is no evidence or argument that the videos do not meet this standard.

For these reasons, the court concludes that Studiorotan has proven that it owns valid copyrights for the competition videos and both competition posters.

### b.    Copying

The second element of copyright infringement, copying, requires "'two separate inquiries: (1) whether the defendant, as a factual matter, copied portions of the plaintiff's program; and (2) whether, as a mixed issue of fact and law, those elements of the program that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable.'" *MiTek Holdings, Inc. v. Arce Eng. Co., Inc*. 89 F.3d 1548, 1554 (11th Cir. 1996) (quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd*., 9 F.3d 823, 832 (10th Cir. 1993)).

Most courts describe these two inquiries as factual copying and either legal or actionable copying. *See Newman*, 959 F.3d at 1301.

### i. *Factual Copying*

A plaintiff can show factual copying by direct or indirect evidence. Because direct evidence of copying is rare, a plaintiff may prove copying indirectly by "'demonstrating that the defendant had access to the copyrighted work and that there are probative similarities between the allegedly infringing work and the copyrighted work.'" *Newman*, 959 F.3d at 1301 (quoting *MiTek*, 89 F.3d at 1554). "Access requires proof of 'a reasonable opportunity to view' the work in question." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1253 (11th Cir. 2007) (quoting *Herzog v. Castle Rock Ent.*, 193 F.3d 1241, 1249 (11th Cir. 1999)). Probative similarity "'exists where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000) (quoting *Orig. App. Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982)).

Kemp-Rotan's testimony establishes that Howell and M.O.V.E. had access to all of the copyrighted works. She testified that she sent all of the copyrighted videos to Howell. Doc. 49 at 70, 74–81. She also sent both Poster 1 and Poster 2 to Howell. Doc. 49 at 105 & 109. Howell does not dispute this testimony.

Despite access, Studiorotan did not present any evidence of factual copying

of the Africatown Design Competition Poster 2—a point that Studiorotan's counsel conceded at the hearing. Doc. 49 at 123–24.  For this reason, Studiorotan has not established a likelihood of success on the merits as to Competition Poster 2, and the motion for preliminary injunction is due to be denied as to this work.

Likewise, Studiorotan did not present evidence of factual copying of the content of the competition videos.  Studiorotan's counsel argues that Howell and M.O.V.E. copied the videos, placed them on the competition website, and kept them there without authorization after Kemp-Rotan demanded their removal.  But the only evidence before the court is a static screen capture of the front page of the competition website. Doc. 45-15.  That image depicts thumbnails of each of the nine Competition videos under the title "Competition Animations." Doc. 45-15 at 5. Kemp-Rotan testified that the nine thumbnails correspond with the nine videos in the copyright registration. Doc. 49 at 70, 74–90.  And she testified that Howell exclusively controls and maintains the competition website. Doc. 49 at 66.  What Studiorotan did not present, however, is any evidence that the videos themselves are accessible through the website.  In fact, defense counsel claimed that the videos are not available if a person clicks on the thumbnails. Doc. 49 at 124–25.  Regardless, Studiorotan did not present evidence that Howell or M.O.V.E. copied the content of the videos—only the thumbnails of each video.  On such an incomplete record, the court can find a substantial likelihood of success only as to the thumbnails.

Finally, the court rejects Howell and M.O.V.E.'s argument that the content of the Competition Poster 1 and the image on the competition website are not probatively similar. *See* Doc. 49 at 125.  At the hearing, defense counsel insinuated that the website may depict an older version[2] of Poster 1 that was not copyrighted. Doc. 49 at 113–18.  Because the images on the exhibit capturing the website were so small, however, Kemp-Rotan could not tell whether the wording had been changed (Doc. 49 at 117–18), and she "assume[d] it's the updated version because we were trying to keep the website current." Doc. 49 at 118.  Regardless of the version on the website, the court concludes that any slight change in the image does not result in a material difference to the overall imagery of the poster and that an "'average lay observer would recognize the [image on the website] as having been appropriated from the copyrighted work.'" *Leigh*, 212 F.3d at 1214 (citation omitted).

The court therefore finds that Studiorotan has established actual copying as to Poster 1 and the thumbnails of the nine competition videos.

### ii.    *Legal Copying*

"Legal—or actionable—copying occurs when those elements of the [copyrighted work] that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *Newman*, 959

---

[2] One of the 16 venues listed on the poster changed during the competition. Doc. 49 at 113–14.

F.3d at 1302 (quotations omitted). "In most cases, a 'substantial similarity between the allegedly offending program and the protectable, original elements of the copyrighted works' establishes actionable copying." *Newman*, 959 F.3d at 1302 (quoting *Bateman*, 79 F.3d at 1542, and citing *BUC*, 489 F.3d at 1149 n.42 ("BellSouth established the 'substantial similarity' standard as the default mode of analysis for compilation copyright claims.")); *Feist Publ., Inc. v. Rural Tel. Serv. Co., Inc*., 499 U.S. 340, 359 (1991). A court must assess "both the quantitative and the qualitative significance" of the protectible elements that the infringing work purportedly copies from "the copyrighted work as a whole." *Newman*, 959 F.3d at 1302.

Considering this standard, the court finds that Studiorotan has proven legal copying. Howell and M.O.V.E. do not argue that the thumbnails are not substantially similar and, for the reasons discussed above, the court also finds that the image of Competition Poster 1 depicted on the website is substantially similar to the copyrighted image. Accordingly, the court finds that Studiorotan has shown a substantial likelihood of success on the merits of her copyright claims as to Competition Poster 1 and the thumbnail images of the competition videos.

### 2.    *Irreparable Harm*

The court next considers whether Studiorotan has established that it will be irreparably harmed if the court does not enter a preliminary injunction as to these

copyrighted items. "A showing of irreparable injury is the *sine qua non* of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (cleaned up). That showing requires Studiorotan to establish that the irreparable injury is "neither remote nor speculative, but actual and imminent," *N. Fla. Ch. of the Assoc. of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990), and not compensable by monetary damages. *See Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) (citing *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983)).

At the hearing, Studiorotan argued that there is an "implied assumption under the Copyright Act . . . that the continued use of copyrighted material without permission and without a license is irreparable injury." Doc. 49 at 127. The court declines to adopt that assumption. In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393–94 (2006), the Supreme Court "rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."[3] Instead, the Court instructed district courts to apply the "traditional four-factor framework that governs the award of injunctive relief" and eschew "categorical rule[s]" that depart from the usual

---

[3] Although *eBay* addresses permanent injunctions, "no obvious distinction exists between permanent and preliminary injunctive relief to suggest that *eBay* should not apply to the latter." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228 (11th Cir. 2008); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 480, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction").

equitable inquiry. *Id*.  The Supreme Court reiterated this approach in *Winter v. NRDC, Inc*., 555 U.S. 7, 32 (2008), observing that an "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Id*.

    After *eBay*, most courts have concluded that the presumption of irreparable harm no longer applies to requests for preliminary injunctive relief. *See, e.g.*, *Bethesda Softworks, LLC v. Interplay Ent. Corp*., 452 F. App'x 351, 355 (4th Cir. 2011) (agreeing that *eBay* applies to requests for permanent and preliminary injunctions in copyright cases); *Robert Bosch LLC v. Pylon Mfg. Corp*., 659 F.3d 1142, 1149 (F. Cir. 2011) ("We take this opportunity to put the question to rest and confirm that *eBay* jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief."); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc*., 654 F.3d 989, 998 (9th Cir. 2011) ("We conclude that presuming irreparable harm in a copyright infringement case is inconsistent with, and disapproved by, the Supreme Court's opinions in *eBay* and *Winter*."): *Tiber Labs., LLC v. Hawthorn Pharms., Inc*., 527 F. Supp. 2d 1373, 1381 (N.D. Ga. Sept. 12, 2007) ("This Court agrees that *eBay* does not leave room for a presumption of irreparable injury in patent cases, whether raised at the preliminary or permanent

injunction phase.").  Although the Eleventh Circuit declined to answer this question[4] because "the district court ha[d] not addressed the effect of *eBay*," *N. Am. Med. Corp.*, 522 F.3d at 1228, the reasoning of the courts that have addressed it is persuasive.  This court therefore finds that a presumption of irreparable harm is inappropriate in this case.

Studiorotan also argues that irreparable harm exists because it has "suffered monetary loss through breach of a services contract" and "loss of goodwill, professional relationships, intellectual property rights, and reputational damages." Doc. 28-1 at 12–13.  But monetary loss is not irreparable harm. *See Cunningham*, 808 F.2d at 821.  The court also rejects Studiorotan's argument about goodwill and reputational harm since these damages are better attributed to the defamation claim than the copyright claim.[5]  There is no evidence that the continued use of the poster or videos has damaged Kemp-Rotan's professional relationships and reputation.

The court is hard pressed to find any evidence of an actual and imminent injury flowing from the use of Poster 1 and the competition videos that cannot be compensated by money damages.  For example, Studiorotan did not offer any

---

[4] The Eleventh Circuit has suggested that the presumption is a matter of a district court's discretion "in light of the historical traditions" of equity. *N. Am. Med. Corp.*, 522 F.3d at 1228.  To the extent this is discretionary, the court declines to apply a presumption of irreparable harm based on the facts presented here.

[5] For example, in her affidavit Kemp-Rotan states that the failure to pay the speakers and judges she secured "damaged [her] professional relationships" and that "Howell began to interfere with and undermine [Kemp-Rotan's] professional reputation and relationships" after the competition. Doc. 28-2 at 3.

evidence of recent traffic (or any traffic) to the competition website or proof that Howell or M.O.V.E. are currently using or plan to use the copyrighted poster and thumbnails in the future beyond their existing placement on the website. And although the website contains a request for donations (*see* Doc. 48-15 at 5), Studiorotan did not present any evidence that Howell or M.O.V.E. received donations through the website. These omissions are especially telling when the design competition ended in 2023. Injunctive relief is prospective relief intended to protect against injury that might occur if the conduct is not stopped. *Alabama v. U.S. Army Corps of Engs.*, 424 F.3d 1117, 1133 (11th Cir. 2005). In this light, Studiorotan did not present evidence of any immediate threat of harm stemming from inappropriate access to Poster 1 or the thumbnails on the website, nor did it present any evidence of further inappropriate access or use. *See Allied Portables, LLC v. Youmans*, 2015 WL 6813669, at *4 (M.D. Fla. Nov. 6, 2015) (finding no irreparable injury where the alleged violation occurred more than a year before and the plaintiff presented no other evidence of future harm); *see Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d. 1279, 1296–97 (S.D. Fla. 2020) (finding irreparable harm because of retained access to servers hosting proprietary information).

Finally, Studiorotan's failure to move for a preliminary injunction until more than ten months after Kemp-Rotan warned Howell and M.O.V.E. that they were infringing on her copyrights substantially undermines its claim of irreparable harm

and request for emergency relief. Urgency forms the heart of a preliminary injunction. *See Wreal, LLC v. Amazon.com, Inc.,* 840 F.3d 1244, 1248 (11th Cir. 2016) ("[T]he very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits."). "[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff's rights." *Seiko Kabushki Kaisha v. Swiss Watch Int., Inc*., 188 F. Supp. 2d 1350, 1356 (S.D. Fla. 2002). For this reason, "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC*, 840 F.3d at 1248.

Imminent harm includes "a consideration of whether the [p]laintiff[] acted sufficiently quickly to obtain relief." *Thompson v. Merrill*, 2020 WL 3513497, at *3 (M.D. Ala. June 29, 2020). "Two time periods are relevant in determining whether a plaintiff acts promptly in seeking judicial relief: (1) a plaintiff cannot delay in filing a complaint after discovering a potential infringer, and (2) a plaintiff must move quickly in filing a motion for a preliminary injunction once a complaint has been filed." *Car Body Lab, Inc., v. Lithia Motors, Inc*., 2021 WL 2652774, at *12 (S.D. Fla. June 21, 2021) (citing *Wells Fargo & Co. v. WhenU.com, Inc*., 293 F. Supp. 2d 734, 771–72 (E.D. Mich. 2003)). "Courts (both in and outside the Eleventh Circuit) have held that unexplained delays of a few months negate any claim of irreparable

harm on a preliminary injunction motion," *Pals Grp., Inc. v. Quiskeya Trading Corp.*, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017), and "typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998); *see, e.g.*, *Apple, Inc. v. Samsung Elecs. Co. (Apple I)*, 678 F.3d 1314, 1319 (Fed. Cir. 2012) (affirming denial of preliminary injunction in part because Apple's two-and-a-half month delay "undermined its claim of irreparable harm."); *Millennium Funding, Inc. v. 1701 Mgmt. LLC*, 2021 WL 3618227, at *9 (S.D. Fla. Aug. 16, 2021) (collecting cases denying injunctive relief when plaintiffs delayed between two and twelve months); *Badillo v. Playboy Ent. Grp., Inc*., 2004 WL 1013372, at *2 (M.D. Fla. Apr. 16, 2004) (denying preliminary injunction in part due to a nine-month delay); *Wells Fargo & Co.*, 293 F. Supp. 2d at 771–72 (finding plaintiffs' nine-month delay before "seeking a preliminary injunction undermines their allegation of irreparable harm"); *Greenpoint Fin. Corp. v. Sperry & Hutchinson Co*., 116 F. Supp. 2d 405, 408–09 (S.D.N.Y. 2000) (denying preliminary injunction after four-month delay).

Here, Kemp-Rotan notified the M.O.V.E. directors of her belief that Howell and M.O.V.E. were infringing on her rights by their continued use of her copyrights no later than July 10, 2024, when she sent the cease-and-desist letter. *See* Doc. 48-13. Studiorotan did not file its complaint until five months later. Doc. 1. And it did

not seek a preliminary injunction until more than ten months later. Doc. 28. Studiorotan has not justified this delay.

For these reasons, Studiorotan has not demonstrated irreparable future harm that will result without a preliminary injunction. Because of this conclusion, the court does not address the remaining elements. *See N. Fla. Ch. of the Assoc. of Gen. Contractors*, 896 F.2d at 1285 ("We need not address each element because we conclude that no showing of irreparable injury was made.").[6]  The court will deny the motion for preliminary injunction as to the copyright claims.

## B.    Defamation

Ordinarily, the court would begin its analysis of the defamation claim by considering whether Studiorotan has met its burden with respect to the traditional elements of a preliminary injunction.  But the court must address a threshold issue instead: the First Amendment to the United States Constitution.

The First Amendment prohibits almost all restraints on future speech. *See, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971); *Sindi v. El-Moslimany*, 896 F.3d 1, 31–32 (1st Cir. 2018).  As the Supreme Court has observed, the First Amendment generally forbids the government, including the judiciary,

---

[6] The court "cautions Defendant that this is not necessarily a victory" on the ultimate questions at issue in this lawsuit. *Malicious Women Candle Co., LLC v. Cox*, 2020 WL 7350399, at \*2 (M.D. Fla. Dec. 14, 2020) (denying motion for preliminary injunction because of delay but observing that the denial "does not mean that Defendant is absolved of consequences in the interim[; i]t just means that Defendant may feel damages later rather than sooner").

"from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002). An injunction that forbids certain communications before they are made is known as a "prior restraint" on speech. *Alexander v. United States*, 509 U.S. 544, 550 (1993); *McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015) ("'Prior restraint' is just a fancy term for censorship, which means prohibiting speech before the speech is uttered or otherwise disseminated.").

A "prior restraint[ ] on speech and publication [is] the most serious and least tolerable infringement on [a person's] First Amendment rights." *Neb. Press Assoc. v. Stuart*, 427 U.S. 539, 559 (1976) (collecting decisions). As the Supreme Court noted, "[a]ny prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). Although prior restraints on speech are not inherently unconstitutional, courts may impose them only to further "the essential needs of the public order," *Carroll v. President & Comm. of Princess Anne*, 393 U.S. 175, 183 (1968), and any restraint is subject to strict scrutiny under the First Amendment. *Sindi*, 896 F.3d at 31–32.

The courts are divided on the question whether prior restraints of defamatory statements violate the First Amendment. Traditionally, many courts have doubted the constitutionality of injunctions to enjoin speech under both the common law and the First Amendment prior restraint doctrine. *See, e.g.*, *Alberti v. Cruise*, 383 F.2d

268, 272 (4th Cir. 1967); *Kinney v. Barnes*, 443 S.W. 3d 87, 93–94 (Tex. 2014); *see also* Erwin Chemerinsky, Injunctions in Defamation Cases, 57 Syracuse L. Rev. 157 (2007).  More recently, however, six federal circuit courts have concluded that a narrowly tailored permanent injunction is constitutionally permissible after an adjudication on the merits. *See McCarthy v. Fuller*, 810 F.3d 456, 462 (7th Cir. 2015); *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1239 (9th Cir. 1997); *Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993); *Brown v. Petrolite Corp.,* 965 F.2d 38, 51 (5th Cir. 1992); *Kramer v. Thompson*, 947 F.2d 666, 675 (3d Cir. 1991); *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1208–09 (6th Cir. 1990) (Wellford, J., concurring in part and dissenting in part)[7]; *see also* 42 Am. Jur. 2d Injunctions § 97.  The courts in this "modern" camp conclude that "once a judge or jury has made a final determination that the speech at issue is defamatory, an injunction prohibiting the defendant from repeating the defamatory speech does not constitute a prohibited prior restraint on speech." *Wagner Equip. Co. v. Wood*, 893 F. Supp. 2d 1157, 1161 (D.N.M. 2012) (collecting cases).  The Eleventh Circuit has not weighed in on the issue.

Regardless of this evolving doctrine, it would be extraordinary for a federal court to enter a preliminary injunction on a defamation claim. *See Banks v. Jackson*,

---

[7] Judge Hull joined Judge Wellford's concurring and dissenting opinion, so the dissent became "the opinion of the court on this issue." *Lothschuetz*, 898 F.2d at 1206.

2020 WL 6870739, at *2 (D. Colo. Oct. 2, 2020) (finding that "a preliminary prior restraint . . . is, in fact, something the court cannot do").  This is because a preliminary injunction does not follow an adjudication on the merits of the defamation claim—something all circuits that permit an injunction on prior speech require before its issuance.[8]

Here, there has not been a final determination that any of the defendants' statements are false and defamatory.  "[G]ranting a preliminary injunction on this basis would require this [c]ourt to evaluate [Defendant's] speech and, at a minimum, pass judgment on the truth or falsity of that speech and its potential for harm." *Williams*, 458 F. Supp. 3d at 479.  The court refuses to do so.  For this reason, the motion for a preliminary injunction on the defamation claim is due to be denied.

## IV.  CONCLUSION

For these reasons, it is ORDERED that the Motion for Preliminary Injection (Doc. 28) is DENIED.

DONE and ORDERED on October 31, 2025.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

---

[8] The court did find a few opinions granting motions for preliminary injunctions on defamation claims, but those courts did not consider the First Amendment implications of this form of relief. *See, e.g.*, *Safex Found., Inc. v. Safeh, Ltd.*, 531 F. Supp. 3d 285 at 301–14 (D. D.C. 2021); *Muhaisen v. Does 1 Through 100*, 2017 WL 4012132, at *1–3 (D. Colo. Sept. 12, 2017).